**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| **In re:**<br>**HALKER CONSULTING LLC**<br>**EIN: 20-4611545,**<br>**Debtors.** | **Case No. 17-15141-MER**<br>**Chapter 11** |
| **In re:**<br>**MATTHEW HALKER**<br>**SS#: XXX-XX-8528,**<br>**Debtor.** | **Case No. 17-15143-TBM**<br>**Chapter 11** |

# DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HALKER CONSULTING LLC AND MATTHEW HALKER

KUTAK ROCK LLP

Adam L. Hirsch (CO Bar No. 44306)
1801 California St., Suite 3000
Denver, Colorado 80202
Telephone: (303) 297-2400
Facsimile: (303) 292-7799
e-mail: adam.hirsch@kutakrock.com

Attorneys for Debtors,
Halker Consulting LLC and Matthew Halker

Dated: Denver, Colorado
June 1, 2017

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH PROPOSED TRANSACTION CONTEMPLATED BY THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN, ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN, ATTACHED HERETO, OR INCORPORATED HEREIN BY REFERENCE IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS HAVE PREPARED THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IT IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. ALTHOUGH THE

DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).

THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 4 OF THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, ARE NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") HAS NOT APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT, NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

Page

**ARTICLE I. EXECUTIVE SUMMARY ........ 1**

A. Purpose and Effect of the Plan ........ 2
B. Treatment of Claims and Interests under the Plan ........ 3
C. Recovery Analysis ........ 8
D. Voting on the Plan ........ 8
E. Combined Hearing and Re-Solicitation ........ 10
F. Confirmation Hearing and Deadline for Objections to Confirmation ........ 10

**ARTICLE II. DESCRIPTION AND HISTORY OF BUSINESS AND EVENTS LEADING TO CHAPTER 11 CASES ........ 11**

A. Matthew Halker ........ 11
B. Halker Consulting's Businesses ........ 12
C. Halker Consulting's Corporate and Capital Structure ........ 12

**ARTICLE III. EVENTS LEADING UP TO THE CHAPTER 11 CASES ........ 13**

A. Halker Consulting's Growth, Decline, and Recovery ........ 13
B. Apogee Lease and Litigation ........ 14
C. The Debtors' Decision to Commence the Chapter 11 Cases ........ 14

**ARTICLE IV. THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS AND INITIATIVES ........ 15**

A. Overview of Chapter 11 ........ 15
B. Certain Significant Events and Initiatives during the Chapter 11 Cases ........ 16

**ARTICLE V. SUMMARY OF THE PLAN OF REORGANIZATION ........ 16**

A. Overview of the Plan of Organization ........ 16
B. Classification and Treatment of Claims and Interests ........ 18
C. Acceptance or Rejection of the Plan ........ 25
D. Implementation of the Plan ........ 26
E. Provisions Governing Distributions ........ 27
F. Disputed Claims ........ 28
G. Substantive Consolidation of the Debtors for Plan Purposes ........ 29
H. Executory Contracts and Unexpired Leases ........ 30
I. Effect of Confirmation ........ 31
J. Conditions Precedent to Confirmation and Consummation of the Plan ........ 33
K. Modification, Revocation or Withdrawal of the Plan ........ 34
L. Retention of Jurisdiction by the Bankruptcy Court ........ 34
M. Miscellaneous ........ 35

**ARTICLE VI. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .......... 36**

A. The Confirmation Hearing .......... 37
B. Confirmation Standards .......... 37
C. Best Interests Test .......... 39
D. Financial Feasibility .......... 40
E. Acceptance by Impaired Classes .......... 41
F. Confirmation without Acceptance by All Impaired Classes .......... 41
G. Classification .......... 42

**ARTICLE VII. VOTING PROCEDURES .......... 42**

A. Who Is Entitled to Vote on the Plan? .......... 43
B. Voting Procedures .......... 43

**ARTICLE VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 44**

**ARTICLE IX. RECOMMENDATION .......... 44**

**EXHIBITS**

EXHIBIT A Joint Chapter 11 Plan of Reorganization
EXHIBIT B Financial Projections for Halker Consulting
EXHIBIT C Liquidation Analysis

# ARTICLE I.
# EXECUTIVE SUMMARY

Halker Consulting LLC ("Halker Consulting"), a Colorado limited liability company, and Matthew Halker, an individual and Halker Consulting's president and sole member ("M. Halker," and together with Halker Consulting, the "Debtors") each a commenced a chapter 11 case (collectively, the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") on June 1, 2017 (the "Petition Date"). The Chapter 11 Cases are jointly administered for procedural purposes only under lead case number 17-[_______].

The Debtors submit this disclosure statement (this "Disclosure Statement") in accordance with section 1125 of the Bankruptcy Code to provide information regarding the Debtors' Joint Chapter 11 Plan of Reorganization (as amended, supplemented, or modified from time to time, the "Plan"), dated June 1, 2017. A copy of the Plan is attached to this Disclosure Statement as Exhibit A and incorporated herein by reference. All capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings given to them in the Plan. The rules of interpretation set forth in Article I.A of the Plan govern the interpretation of this Disclosure Statement.

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan. Certain provisions of the Plan (and the descriptions and summaries contained herein) may remain the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.

The Debtors believe that the compromises and transactions contemplated by the Plan are fair and equitable, maximize the value of the Debtors' chapter 11 estates (collectively, the "Estates"), and provide the best recovery to claimholders, who will all be paid in full on account of their allowed claims under the Plan. Accordingly, the Debtors are seeking the Bankruptcy Court's approval of the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of that chapter 11 plan. The Debtors submit this Disclosure Statement in accordance with such requirements. This Disclosure Statement includes information about:

- Halker Consulting's corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article II);
- events leading to the Chapter 11 Cases (Article III);
- material events in the Chapter 11 Cases (Article IV.B);
- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article V);
- the statutory requirements for confirming the Plan (Article VI);

- voting procedures (Article VII); and
- certain United States federal income tax consequences of the Plan (Article VIII).

In light of the foregoing, this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. The Debtors further believe that the Plan is in the best interest of the Estates and, accordingly, recommend that you vote to accept the Plan.

**THIS EXECUTIVE SUMMARY ONLY PROVIDES A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN. THE EXECUTIVE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN. THE DEBTORS STRONGLY RECOMMEND READING THE EXECUTIVE SUMMARY IN CONJUNCTION WITH THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN.**

## A. Purpose and Effect of the Plan

The Plan is predicated on, among other things, Halker Consulting's continued viability. Halker Consulting's financial projections during the life of the Plan are attached to this disclosure statement as Exhibit B.

The Debtors are seeking to implement the Plan under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all legal and equitable interests of the debtors as of the commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth how a debtor will treat claims and equity interests, and a bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan. A chapter 11 plan divides claims and equity interests into "classes" according to their relative priority and other criteria.

## B. Treatment of Claims and Interests under the Plan

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes (a) the underlying "Claim" or "Equity Interest," (b) the recovery available to the holders of Claims or Equity Interests (collectively, "Holders") in that Class under the Plan, (c) whether the Class is "Impaired" under the Plan, meaning that each Holder will receive less than full value on account of its Claim or Equity Interest or that the rights of Holders under law will be altered in some way (*e.g.*, receiving equity interests instead of holding a Claim), and (d) the form of consideration (*e.g.*, cash, equity interests, new debt, or a combination thereof), if any, that such Holders will receive on account of their respective Claims or Equity Interests.

The table below provides a summary of the classification, treatment, and estimated recoveries of Claims and Equity Interests under the Plan. The table provides this information for illustrative purposes only, is subject to material change based on contingencies related to the claims-reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Equity Interests under the Plan, see Article V of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE SUBJECT TO CHANGE. THE DEBTORS MAKE NO REPRESENTATIONS OR GUARANTEES AS TO THE ACCURACY OF THESE ESTIMATES.**

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Recovery |
|---|---|---|---|---|
| **1** | **Chase Secured Claim** | Pursuant to section 1124(2) of the Bankruptcy Code, on the Effective Date, (i) M. Halker will cure any default with respect to the Chase Secured Claim that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the maturity of the Chase Secured Claim will be reinstated as such maturity existed before any default; (iii) Chase shall retain its liens and security interests with the same validity, priority, force, and effect as before the Petition Date; and (iv) nothing in this Plan or the Confirmation Order will otherwise alter the legal, equitable, or contractual rights to which the Chase Secured Claim entitles Chase. | Apprx. $1,987,072.92 | 100% |
| **2** | **CoBiz Secured Claim** | Deemed an Allowed Secured Claim under the Plan. On the Effective Date, (i) CoBiz will retain its liens on and security interests in the Reorganized Debtors' property with the same validity, priority, force, and effect as before the Petition Date, and (ii) Halker Consulting will issue the New CoBiz Note to CoBiz on account of the Allowed CoBiz Secured Claim. The New CoBiz Note will provide for, among other things, monthly payments to CoBiz, commencing on the last day of the month immediately following the month of the Effective Date, in the amount of (i) $50,000, plus (ii) 50% of Halker Consulting's monthly profits, if any, after the fixed $50,000 monthly payment for the preceding the month of payment, until the CoBiz is paid in full in accordance with the Plan. | Apprx. $1,345,936.39 | 100% |

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Recovery |
|---|---|---|---|---|
| **3** | **Coulton Creek Secured Claim** | Deemed an Allowed Secured Claim under the Plan. On the Effective Date, (i) Coulton Creek will retain its liens on and security interests in the Reorganized Debtors' property with the same validity, priority, force, and effect as before the Petition Date, and (ii) Halker Consulting will issue the New Coulton Creek Note to Coulton Creek on account of the Allowed Coulton Creek Secured Claim. The New Coulton Creek Note will provide for, among other things, payments to Coulton Creek, commencing when CoBiz is paid in full on account of its allowed claim, in the amount of (i) $50,000.00 per month, plus (ii) 50% of Halker Consulting's monthly profits, if any, for the preceding the month of payment in excess of a monthly working capital reserve in the amount of $50,000, until Coulton Creek is paid in full under the Plan. | Apprx. $772,550.00 | 100% |
| **4** | **Other Secured Claims** | On the later of (a) the Distribution Date, or (b) the date an Other Secured Claim becomes an Allowed Other Secured Claim, (a) in the Reorganized Debtors' sole discretion, (i) Cash in an amount equal to the unpaid portion of such Allowed Other Secured Claim, or (ii) such treatment as is necessary to comply with section 1124(2) of the Bankruptcy Code; or (b) such other treatment as the Debtors or the Reorganized Debtors, as applicable, and such Holder shall have agreed upon in writing. | TBD[1] | 100% |

[1] The Debtors have requested a bar date of [___________]. Any allowed Other Secured Claims will be paid as set forth above.

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Recovery |
|---|---|---|---|---|
| **5** | **Other Priority Claims** | On the later of (i) the Distribution Date, or (ii) the date an Other Priority Claim becomes an Allowed Other Priority Claim, (i) Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim with Post-Petition Interest thereon, or (ii) such other treatment as the Debtor and such Holder shall have agreed upon in writing. | TBD[2] | 100% |
| **6** | **Critical Vendor Claims** | On the later of (i) the Distribution Date, or (ii) the date that a Critical Vendor Claim becomes an Allowed Critical Vendor Claim, (i) Cash in an amount equal to the unpaid portion of such Allowed Critical Vendor Claim with Post-Petition Interest thereon, or (ii) such other treatment as Halker Consulting or Reorganized Halker Consulting, as applicable, and such Holder shall have agreed upon in writing. | $[_______] | 100% |

[2] The Debtors are unaware of any Other Priority Claims that must be paid under the Plan. They have requested a bar date of [___________]. Any allowed Other Priority Claims will be paid as set forth above.

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Recovery |
|---|---|---|---|---|
| **7** | **General Unsecured Claims against Halker Consulting** | Commencing on the later of (i) the last date of the month immediately following the month when Coulton Creek is paid in full in accordance with the Plan, and (ii) the date such General Unsecured Claim against Halker Consulting becomes an Allowed General Unsecured Claim against Halker Consulting, such Holder's *pro rata* share of the sum of (i) $50,000.00 per month, plus (ii) 50% of Halker Consulting's monthly profits, if any, for the preceding the month in excess of a monthly working capital reserve in the amount of $50,000, with interest to accrue on the unpaid portion of such Allowed General Unsecured Claim from the Effective Date at a rate of 7% per annum, until paid in full, or (b) such other treatment as Halker Consulting or Reorganized Halker Consulting, as applicable, and such Holder shall have agreed upon in writing. All distributions on account of Allowed General Unsecured Claims against Halker Consulting will be made quarterly, on the 15th day of the month. | $[_______] | 100% |
| **8** | **General Unsecured Claims against M. Halker** | On the later of (i) the Distribution Date, or (ii) the date that a General Unsecured Claim against M. Halker that is not on account of or otherwise related in any way to a guaranty or primary obligation of Halker Consulting becomes an Allowed General Unsecured Claim against M. Halker, (i) Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim against M. Halker with Post-Petition Interest thereon, or (ii) such other treatment as M. Halker and such Holder shall have agreed upon in writing. | $[__________] | 100% |

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Recovery |
|---|---|---|---|---|
| 9 | **Equity Interests in Halker Consulting** | M. Halker will retain his equity interests in Halker Consulting; *provided*, *however*, that until all Allowed Claims in Class 7 (General Unsecured Claims Against Halker Consulting) are paid in full in accordance with the Plan and the Confirmation Order, Halker Consulting will not declare or pay any dividends or otherwise make any distributions to Holders of Interests in Halker Consulting on account of such Interests except as may be necessary to pay taxes attributable to Halker Consulting. | N/A | N/A |

### C. Recovery Analysis

In developing the Plan, the Debtors gave due consideration to various restructuring alternatives.

With the assistance of their professional advisors, the Debtors conducted careful reviews of their current operations, prospects as an ongoing business, financial projections, and estimated recoveries in a chapter 7 liquidation scenario. Consistent with the liquidation analysis prepared by the Debtors with the assistance of their advisors (*see* Exhibit C attached hereto), the Debtors believe that any alternative to Confirmation, such as a chapter 7 liquidation, would result in little, if any recovery for unsecured creditors, significant delays, litigation, and additional costs and would negatively affect value by causing Halker Consulting to cease operations, terminating the revenue stream that the Plan allocates to creditor recoveries.

### D. Voting on the Plan

#### 1. Holders of Claims Entitled to Vote on the Plan

This Disclosure Statement is being transmitted to certain Holders for the purpose of soliciting votes on the Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable holders of Claims that are entitled to vote on the Plan to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

All holders of Claims are encouraged to read this Disclosure Statement, its exhibits, and the Plan Supplement carefully and in their entirety before, if applicable, deciding to vote either to accept or to reject the Plan. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan and developments

concerning the Chapter 11 Cases. The documents comprising the original Plan Supplement were filed on or about [________], 2017 [Docket No. ____], and included the New CoBiz Note and the New Coulton Creek Note, which evidence the Reorganized Debtors' anticipated indebtedness to CoBiz and Coulton Creek under the Plan.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions, and projections that may be materially different from actual and future results. This Disclosure Statement contains projections of future performance of Halker Consulting, attached as Exhibit B. Other events may occur subsequent to the date of this disclosure statement that may have a material impact on the information contained in this Disclosure Statement. Except as expressly stated, the Debtors do not intend to update the Disclosure Statement, including, without limitation, the financial projections. Thus, neither the Disclosure Statement nor the financial projections will reflect the impact of any subsequent events, including any not already accounted for in the assumptions underlying the financial projections. Further, the Debtors do not anticipate that any updates, amendments, or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

In general, a holder of a claim or equity interest may vote to accept or reject a chapter 11 plan if (i) no party in interest has objected to such claim or interest (or the claim or interest has been allowed subsequent to any objection or estimated for voting purposes), (ii) the claim or interest is impaired by the plan, and (iii) the holder of such claim or interest will receive or retain property under the plan on account of such claim or interest. The holders of Claims in the following Classes are entitled to vote on the Plan:

- Class 2 (CoBiz Secured Claim)
- Class 3 (Coulton Creek Secured Claim)
- Class 7 (General Unsecured Claims against Halker Consulting)

In general, if a claim is unimpaired under a chapter 11 plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim to have accepted the plan and thus the holders of claims in such unimpaired classes are not entitled to vote on the plan. Because the following Classes are Unimpaired under the Plan, the holders of Claims in these Classes are not entitled to vote:

- Class 1 (Chase Secured Claim)
- Class 4 (Other Secured Claims)

- Class 5 (Other Priority Claims)
- Class 6 (Critical Vendor Claims)
- Class 8 (General Unsecured Claims against M. Halker)
- Class 9 (Interest in Halker Consulting)

If you are entitled to vote, after carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies with non-original signatures will not be accepted) and submit it pursuant to the instructions set forth on the Ballot. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in disqualification of your vote on such Ballot. Holders of Claims or Interests that fail to vote are not counted as either accepting or rejecting the Plan.

IN THE CASE OF EACH VOTER, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, AND COUNSEL TO THE DEBTORS MUST **ACTUALLY RECEIVE** THE BALLOT ON OR BEFORE [________], 2017, AT 5:00 P.M. (PREVAILING MOUNTAIN TIME), (THE "VOTING DEADLINE").

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.**

## E. Combined Hearing and Re-Solicitation

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing, after notice, on confirmation of a chapter 11 plan. On [___________], 2017, the Bankruptcy Court entered an order [Docket No. __] that, among other things, approved this Disclosure Statement, (b) approved procedures for the solicitation of votes on the Plan, and (c) scheduled a hearing on confirmation of the Plan, on the following timeline. *See* [Docket No. ____].

| **Solicitation and Confirmation Timeline** | |
|---|---|
| [__________], 2017 | Record date for voting on the Plan. |
| [________], 2017 | Deadline to object to the Plan. |
| [___________], 2017 | Deadline to vote on the Plan. |
| [____________], 2015 | Hearing on confirmation of Plan. |

## F. Confirmation Hearing and Deadline for Objections to Confirmation

In accordance with section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the hearing to consider Confirmation (the "Confirmation

Hearing") for [_______], 2017, at [__]:[__] [_].m., prevailing mountain time, before the Honorable [_______], United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Colorado, 721 19th Street, Courtroom [___], Denver, Colorado 80202. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time (i) prior to the Confirmation Hearing by posting notice of the adjournment on the docket for the Chapter 11 Cases, and (ii) at the Confirmation Hearing without further notice except for a notice filed on the Bankruptcy Court's docket or an announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing.

Any objection to Confirmation must be filed with the Bankruptcy Court and served so as to be **actually received** on or before [___________], 2017, by:

(a) Office of the United States Trustee for the District of Colorado (the "U.S. Trustee"), 999 18 St., #1551, Denver, Colorado 80202, Attn: [___________];

(b) Counsel for the Debtors, Kutak Rock LLP, 1801 California St., Suite 3000, Denver, Colorado 80202, Attn: Adam L. Hirsch; and

(c) any other party having entered an appearance in the Chapter 11 Cases.

## ARTICLE II.
## DESCRIPTION AND HISTORY OF BUSINESS AND EVENTS LEADING TO CHAPTER 11 CASES

### A. Matthew Halker

Matthew Halker is an individual residing in Parker Colorado. He is married and has four children. Mr. Halker's wife is not a debtor under the Bankruptcy Code.

Mr. Halker currently resides at 7686 Homestead Road, Parker, Colorado 80138 (the "House"), where he has lived since July, 2015. Before living in the House, Mr. Halker resided at 12167 Tallkad Ct., Parker, Colorado 80138, where he lived beginning in October, 2007.

Mr. Halker and his wife own the House, which is their primary asset. It currently has a value of approximately $2,036,250. Apart from the House, Mr. Halker also has a 100% membership interest in Halker Consulting, a 50% equity interest in Thomas Oil and Gas, LLC ("TOG"), a 50% equity interest in VIM Resources, LLC ("VIM"), and an indirect equity interest in Energy Inspection Services, LLC ("EIS"), in which VIM holds a 51% equity interest.

Mr. Halker's liabilities are primarily obligations that he guarantied for Halker Consulting. These liabilities are discussed below. Apart from these liabilities, Mr. Halker is a co-obligor to JPMorgan Chase Bank, N.A. on the loan that and his wife obtained to finance their purchase of the House (the "Home Loan"). As of the Petition Date, $1,987,072.92 remains due and owing on the Home Loan. Mr. Halker is also indebted to CarMax Auto Finance, which financed his acquisition of a 2016 Ford Expedition EL, which he uses for household purposes. Mr. Halker also owes $14,827.40 in credit card debt as of the Petition Date, and $10,562.87 as of the Petition Date on account of a loan used to finance the acquisition of a tractor.

### B. Halker Consulting's Businesses

Halker Consulting is a nationwide provider of multi-disciplined engineering, design, project management, procurement, and field services for the oil and gas sector. Halker Consulting specializes in multi-well site design, central processing facilities, full field development and optimization, and federal, state, and local regulatory compliance. Halker Consulting operates its business from its primary office location at 7936 E. Arapahoe Ct., Suite 3200, Centennial, Colorado (the "Centennial Office"). It has field operations in Greeley, Colorado; Durango, Colorado; Midland, Texas; and Dickinson, North Dakota.

### C. Halker Consulting's Corporate and Capital Structure

#### 1. Corporate Structure

Matthew Halker formed Halker Consulting on February 11, 2006. It is organized as a single-member Colorado limited liability company. Halker Consulting's sole member is Matthew Halker, and he is currently serves as Halker Consulting's president. Halker Consulting has no equity ownership in any other entity.

#### 2. Prepetition Capital Structure

The approximate outstanding balances of Halker Consulting's secured indebtedness is:

| Debt | Balance |
|---|---|
| CoBiz Loan | $1,345,836.39 as of May 1, 2017 |
| Coulton Creek Loan | $772,550.00 as of May 31, 2017 |

##### a. The CoBiz Loan

Beginning in September 2013, CoBiz provided Halker Consulting with a series of loans to finance its operations in the original aggregate principal amount of $4.25 million (collectively, the "CoBiz Loans"). The CoBiz Loans are evidenced by three promissory notes: (i) a promissory note, dated September 16, 2013, amended on December 1, 2014 and December 21, 2015, in the original principal amount of $1,750,000; (ii) a promissory note, dated September 16, 2013, in the original principal amount of $1,750,000, and (iii) a promissory note, dated September 16, 2013, in the original principal amount of $750,000.

As security for the CoBiz Loans, Halker Consulting granted CoBiz a first-priority lien on and security interest in all of its assets pursuant to certain Commercial Security Agreements, each dated as of September 16, 2013.

Matthew Halker executed and delivered a Commercial Guaranty Agreement, dated as of September 16, 2013, unconditionally guarantying full payment and performance of Halker Consulting's obligations under the CoBiz Loans. As security for the guaranty, Matthew Halker granted CoBiz a first-priority lien on and security interest in his membership interest in Halker Consulting.

As of the May 1, 2017, Halker Consulting's indebtedness to CoBiz was approximately $1,345,836.39, and Halker Consulting and CoBiz were operating under a forbearance agreement through April 30, 2018. As of the Petition Date, Halker Consulting was in compliance with the forbearance agreement.

**b. Coulton Creek Loan**

On November 26, 2014, Coulton Creek provided Halker Consulting, Matthew Halker, and his wife, Gretchen Halker, with additional loans in the aggregate principal amount of up to $2,150,000, comprised of (i) a term loan in the principal amount of $700,000, and (ii) a multi-draw credit line in the principal amount of up to $1,450,000 (together, the "Coulton Creek Loans"). The Coulton Creek Loans were to be used primarily to support portfolio investments and documented income tax obligations up to $500,000.

The Coulton Creek Loans are secured by, among other things, (i) second-priority liens on and security interests in substantially all of Halker Consulting's assets, Matthew Halker's equity in Halker Consulting, and the House, and (ii) a first-priority security interest in Matthew Halker's membership interests in Halker Consulting, VIM, EIS, and TOG. Coulton Creek also has a first-priority security interest in substantially all of Matthew Halker's personal property.

As of the May 31, 2017, Halker Consulting's indebtedness to Coulton Creek was approximately $772,550.

## ARTICLE III.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A. Halker Consulting's Growth, Decline, and Recovery

Beginning with its formation in 2006, Halker Consulting grew with the growth of the energy industry. By the summer of 2014, Halker Consulting had grown to approximately 125 employees and was enjoying monthly revenues of approximately $1.6 million. At that time, Halker Consulting operated near the Denver Tech Center, at 9800 South Meridian Blvd., Suite 200, Englewood, Colorado (the "Englewood Office"), and occupied approximately 40,000 square feet of space under a lease with Apogee Colorado Holdings, LLC ("Apogee").

But beginning in the summer of 2014, the price of crude oil began to plummet from approximately $110 per barrel to less than $30 per barrel by early 2016. The severe drop in oil prices significantly impacted Halker Consulting's business. During the trough in 2016, Halker Consulting's monthly revenue dropped to approximately $200,000 – representing a decline of almost 90% of monthly revenue from the company's peak performance.

Halker Consulting was forced to cut costs to weather the storm. It laid off more than 80% of its employees. To lighten some of its rent expenses, Halker Consulting subleased half of the Englewood office and sought concessions from Apogee. While Apogee consented to the sublease of half of the space and agreed to certain rent abatements, it was unwilling to do more, and Halker Consulting was forced to vacate the premises. It promptly relocated to the Centennial Office – a smaller space – on more favorable lease terms, and Apogee terminated its lease with Halker Consulting.

Halker Consulting has since been able to make substantial progress in turning its business around. As oil prices have recovered, work load has increased and Halker Consulting's monthly revenues have recovered to more than $500,000. These revenues have come primarily from an increased work load, and Halker Consulting has increased its workforce to 65 people to service this work. Halker Consulting expects revenues to remain strong for the foreseeable future.

**B. Apogee Lease and Litigation**

As Halker Consulting continued to grow in 2013, it entered into a lease, dated November 13, 2014, with Apogee for the Englewood Office (as amended, the "Apogee Lease"). The initial term under the Apogee Lease was set to end on July 31, 2021.

As Halker Consulting began to experience financial difficulty and lose employees with the drop in oil prices, Matthew Halker approached Apogee to discuss options, and Apogee agreed to a rent abatement and to consent to sublease approximately half of the Englewood Office. Halker Consulting and Apogee accordingly amended the Apogee Lease on June 23, 2015, abating six months of base rent, re-amortizing the base rent, and extending the term of the Apogee Lease to January 31, 2025. As a condition to entering into this amendment, Apogee required Matthew Halker to execute and deliver a personal guaranty of all obligations under the Apogee Lease up to $2 million (the "Apogee Guaranty").

Oil prices failed to recover, however, and Halker Consulting was unable to make its rent payments under the Apogee Lease. Halker Consulting sent Apogee a letter on March 8, 2016, formally advising Apogee of Halker Consulting's financial issues and measures that Halker Consulting has and would take to cut costs and return to generating net positive income. Apogee would not discuss further accommodations, and Halker Consulting defaulted on its lease obligations to Apogee for the first time in March 2016. Halker Consulting cured the initial March 2016 default, but it was unable to continue paying Apogee the base rent under the Apogee Lease and defaulted again in April 2016. Halker Consulting vacated the Englewood Office in May 2016 and entered into a more affordable lease for the Centennial Office. Apogee terminated the Apogee Lease in August 2016.

Shortly before Apogee terminated the Apogee Lease, it commenced an action against Halker Consulting under the Apogee Lease and Matthew Halker under the Apogee Guaranty in the District Court for Douglas County, Colorado, Case No. 2016CV030726 (the "Apogee Litigation"), on July 19, 2016. Apogee sought damages in excess of $5 million in the Apogee Litigation for breach of the Apogee Lease and the Apogee Guaranty (up to $2 million). A trial date was set in the Apogee litigation to commence on June 29, 2017.

**C. The Debtors' Decision to Commence the Chapter 11 Cases**

Apogee's refusal to settle the Apogee Litigation caused the Debtors to commence the Chapter 11 Cases. Immediately after Apogee commenced the Apogee Litigation and only shortly after Halker Consulting vacated the Englewood Office, the Debtors attempted to engage Apogee on several occasions to resolve their disputes. But Apogee refused to engage in meaningful settlement discussions. The Debtors prepared financial statements for Apogee so that it could understand their financial condition and what the Debtors could reasonably pay. The Debtors

provided Apogee with these financial statements shortly after it commenced the Apogee Litigation and updated them as the litigation progressed. Each time that the Debtors provided the financial information, they proposed terms of settlement that they could realistically pay. Apogee refused to engage. Matthew Halker offered to fly to Chicago, where Apogee's principles maintain offices. But Apogee refused to meet with him. During the course of the litigation, the Debtors presented Apogee with at least four settlement proposals, attempting each time to address what they anticipated Apogee would want. Apogee never responded with a counter-proposal that the Debtors could accept.

With trial approximately one month away, the Debtors determined that Apogee is not interested in settlement and the Chapter 11 Cases are necessary to preserve Halker Consulting's business. Absent a settlement and the commencement of the Chapter 11 Cases, Apogee would likely have sought to become a judgment creditor through the Apogee Litigation, giving it an elevated position that it could use to disrupt Halker Consulting's business and prospects of recovery. If Halker Consulting were to allow Apogee to obtain a judgment, it would risk its ability to repay its debt to its secured lenders (who are senior in priority to Apogee), risk damage to customer relationships, risk damage to critical vendor relationships, and risk the jobs of its 65-person workforce.

The Debtors commenced the Chapter 11 Cases to minimize these risks. To that end, the Debtors propose the Plan, which provides for paying all creditors, including Apogee, in full on account of their Allowed Claims. The Debtors are seeking prompt confirmation of the Plan to meet this goal.

## ARTICLE IV.
## THE CHAPTER 11 CASES AND CERTAIN SIGNIFICANT EVENTS AND INITIATIVES

On June 1, 2017, each Debtor filed with the United States Bankruptcy Court for the District of Colorado a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued to operate their business and manage their properties as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. The following comprises a general summary of the Chapter 11 Cases including, without limitation, a discussion of the Debtors' restructuring and business initiatives since the Petition Date.

### A. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors and its interest holders. Chapter 11 also promotes equality of treatment for similarly situated creditors and similarly situated interest holders.

The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

## B. Certain Significant Events and Initiatives during the Chapter 11 Cases

### 1. Automatic Stay

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors, including the Apogee Litigation.

### 2. Description of Certain Significant First Day Motions and Orders

On the Petition Date, the Debtors filed numerous "first day" motions seeking various relief intended to ensure a seamless transition of the Debtors' business operations into chapter 11 and facilitate an efficient administration of the Chapter 11 Cases. The relief requested in these motions, among other things, allowed the Debtors to continue certain normal business activities that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code may have required prior court approval. Substantially all of the relief requested in the first-day motions was granted by the Bankruptcy Court.

The orders entered pursuant to the Debtors' first-day motions authorized the Debtors to, among other things:

[Insert description of orders once entered.]

# ARTICLE V. SUMMARY OF THE PLAN OF REORGANIZATION

All Creditors will be paid in full on account of their allowed claims under the Plan. The Debtors accordingly believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Debtors' estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code, and (b) consummation of the Plan will maximize the recovery of Creditors and preserve ongoing employment for many of the Debtors' employees and other personnel.

The Plan is attached to this Disclosure Statement as <u>Exhibit A</u> and is incorporated herein by reference.

## A. Overview of the Plan of Organization

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (i) is impaired under or has accepted the plan, or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges a debtor that is not an individual from any debt that arose prior to the date of confirmation of the plan and

substitutes therefor the obligations specified under the confirmed plan. A debtor that is an individual is typically discharged from his or her obligations once all payments under the plan are completed.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to Holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, INCLUDING ANY SUPPLEMENTS AND SCHEDULES THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF CONTROLS THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## B. Classification and Treatment of Claims and Interests

The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims and Interests. Under the Plan, Claims against, and Interests in, the Debtors are divided into different Classes. Under the Bankruptcy Code, claims and equity interests are classified beyond mere "creditors" or "shareholders" because such entities may hold claims or equity interests in more than one class. If the Plan is confirmed by the Bankruptcy Court and consummated, subject to the occurrence of the Plan's Effective Date, the Debtors will make distributions in respect of Classes of Claims as provided in the Plan.

### 1. Summary of Administrative Claims and Priority Tax Claims

#### a. Treatment of Administrative Claims other than Professional Fee Claims

On the latest of (i) the Effective Date, (ii) the date that is five (5) Business Days after the date an Administrative Claim becomes an Allowed Administrative Claim, or (iii) the date that is five (5) Business Days after the date an Administrative Claim becomes payable pursuant to any agreement between the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and the Holder of such Administrative Claim, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim; *provided*, *however*, that post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtors' business, including, but not limited to, trade vendor, employee wage and benefit, and state and local property, sales, and use taxes, to the extent not due and owing as of the Effective Date, will be paid by Debtors in the ordinary course of business, and *provided further* that Allowed Administrative Claims incurred by the Debtors in the ordinary course of the Debtors' business after the Confirmation Date but prior to the Effective Date will not be subject to application and may be paid by the Debtors in the ordinary course of business and without further Bankruptcy Court approval.

Notwithstanding any other provision in the Plan regarding the payment of Administrative Claims, the Debtors will request that the Confirmation Order establish an Administrative Claims Bar Date for filing Administrative Claims, which date shall be 45 days after the Confirmation Date. Holders of asserted Administrative Claims, except for (i) Professional Fee Claims, (ii) United States Trustee fees, and (iii) post-Petition Date liabilities incurred or expenses arising in the ordinary course of the Debtors' business or affairs (including, but not limited to, trade vendor, employee wage and benefit, and state and local property, sales, and use taxes), must submit requests for payment of administrative expenses so as to be *actually received* on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of entry of the Confirmation Order to be delivered pursuant to Fed. R. Bankr. P. 3020(c) and 2002(f) will set forth such date and constitute notice of the Administrative Claims Bar Date. The Debtors shall

have 45 days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

**b. Treatment of Professional Fee Claims**

On the later of (i) the Effective Date, or (ii) the date that is five (5) Business Days after any order allowing a Professional Fee Claim becomes a Final Order, each Holder of an Allowed Professional Fee Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Professional Fee Claim, (x) Cash equal to the unpaid portion of such Allowed Professional Fee Claim, or (y) such other treatment as to which the Debtors or the Reorganized Debtors, as the case may be, and such Holder agree in writing.

All final requests for compensation or reimbursement of Professional Fees pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered to the Debtor prior to the Effective Date (including requests under section 503(b)(4) of the Bankruptcy Code by any Professional or other Entity for making a substantial contribution in the Chapter 11 Cases) must be filed and served so as to be received by the Debtors and their counsel no later than 45 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other Entities for compensation or reimbursement of expenses shall be filed and served on the Debtors and their counsel and the requesting Professional or other Entity no later than 7 days prior to the date on which the Bankruptcy Court schedules a hearing in respect of such Professional Fee Claims. Holders of Professional Fee Claims that do not file such requests by the applicable bar date will be forever barred from asserting such claims against the Debtors, their Estates, or their successors, assigns or property.

**c. Treatment of Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim (a) in the Reorganized Debtors' sole discretion, either (i) on the Effective Date or as soon as practical thereafter, Cash in an amount equal to such Allowed Priority Tax Claim, or (ii) treatment provided under section 1129(a)(9) of the Bankruptcy Code; or (b) such other treatment as to which the Debtor or the Reorganized Debtor, as the case may be, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

**d. Treatment of U.S. Trustee Statutory Fees**

For the avoidance of doubt, all fees payable pursuant to section 1930 of title 28 of the United States Code due and payable through the Effective Date, and any interest accruing thereto, will be paid by the Debtors on or before the Effective Date, and amounts due thereafter will be paid by each Reorganized Debtors until the entry of a final decree closing the respective Debtor's Chapter 11 Case. Any deadline for filing claims in these Chapter 11 Cases will not apply to fees payable by the Debtors pursuant to section 1930 of title 28 of the United States Code or any interest accruing thereto.

**2. Summary of Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests in or against the Debtors for all purposes, including, without limitation, voting, confirmation and distribution, pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official Claims register without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event will any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article III of the Plan.

Below is a summary of the classification and treatment of classified Claims and Interests under the Plan.

1. <u>Class 1 – Chase Secured Claim</u>

(a) *Classification*: Class 1 consists of the Chase Secured Claim.

(b) *Treatment*: Pursuant to section 1124(2) of the Bankruptcy Code, on the Effective Date, (i) Matthew Halker will cure any default with respect to the Chase Secured Claim that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code, which the Bankruptcy Code expressly does not require to be cured; (ii) the maturity of the Chase Secured Claim will be reinstated as such maturity existed before any default; (iii) Chase shall retain its liens and security interests with the same validity, priority, force, and effect as before the Petition Date; and (iv) nothing in the Plan or the Confirmation Order will otherwise alter the legal, equitable, or contractual rights to which the Chase Secured Claim entitles Chase.

(c) *Voting*: Pursuant to section 1124(2) of the Bankruptcy Code, Class 1 is unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, Chase is conclusively presumed to have accepted the Plan.

2. Class 2 – CoBiz Secured Claim

(a) *Classification*: Class 2 consists of the CoBiz Secured Claim.

(b) *Treatment*: The CoBiz Secured Claim will be deemed an Allowed Secured Claim and will be paid in full as provided in the Plan. On the Effective Date, (i) CoBiz will retain its liens on and security interests in the Reorganized Debtors' property with the same validity, priority, force, and effect as before the Petition Date, and (ii) Halker Consulting will issue the New CoBiz Note to CoBiz on account of the Allowed CoBiz Secured Claim. The New CoBiz Note will provide for, among other things, payments to CoBiz, commencing on the last day of the month immediately following the month of the Effective Date, in the amount of (i) $50,000 per month, plus (ii) 50% of Halker Consulting's monthly profits, if any, after payment of the $50,000 fixed payment for the preceding the month of payment, until the CoBiz Final Payment Date. Subject to Article V of the Plan, the CoBiz Guaranty will be reaffirmed and ratified under the Plan and will remain of full force and effect until the CoBiz Secured Claim is paid in full. The Debtors may, but will have no obligation to, prepay any additional amounts on account of the CoBiz Secured Claim, as they wish to pay in their sole discretion. Any prepayment of the CoBiz Secured Claim will be applied to the principal amount due and owing at the time of payment, and the Debtors and the Reorganized Debtors will incur no additional fee, charge, or penalty in connection with any such payment.

(c) *Voting*: The CoBiz Secured Claim is impaired under the Plan and, pursuant to section 1126(a) of the Bankruptcy Code, CoBiz is entitled to vote to accept or reject the Plan.

3. Class 3 – Coulton Creek Secured Claim

(a) *Classification*: Class 3 consists of the Coulton Creek Secured Claim.

(b) *Treatment*: The Coulton Creek Secured Claim will be deemed an Allowed Secured Claim and will be paid in full as provided in the Plan. On the Effective Date, (i) Coulton Creek will retain its liens on and security interests in the Reorganized Debtors' property with the same validity, priority, force, and effect as before the Petition Date, and (ii) Halker Consulting will issue the New Coulton Creek Note to Coulton Creek on account of the Allowed Coulton Creek Secured Claim. The New Coulton Creek Note will provide for, among other things, payments to Coulton Creek, commencing on the last day of the month immediately following CoBiz Final Payment Date, in the amount of (i) $50,000.00 per month, plus (ii) 50% of Halker Consulting's monthly profits, if any, for the preceding the month of payment in excess of a $50,000 Monthly Working Capital Reserve, until the Coulton Creek Final Payment Date. Commencing on the last day of the month immediately following the CoBiz Final Payment Date,

the Debtors may, but will have no obligation to, prepay any additional amounts on account of the Coulton Creek Secured Claim, as they wish to pay in their sole discretion. Any prepayment of the Coulton Creek Secured Claim will be applied to the principal amount due and owing at the time of payment, and the Reorganized Debtors will incur no additional fee, charge, or penalty in connection with any such payment.

(c) *Voting*: The Coulton Creek Secured Claim is impaired under the Plan and, pursuant to section 1126(a) of the Bankruptcy Code, Coulton Creek is entitled to vote to accept or reject the Plan.

4. Class 4 – Other Secured Claims

(a) *Classification*: Class 4 consists of Other Secured Claims.

(b) *Treatment*: On the later of (i) the Distribution Date, or (ii) the date such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim (a) in the Reorganized Debtors' sole discretion, (i) Cash in an amount equal to the unpaid portion of such Allowed Other Secured Claim, or (ii) such treatment as is necessary to comply with section 1124(2) of the Bankruptcy Code; or (b) such other treatment as the Debtor and such Holder shall have agreed upon in writing.

(c) *Voting*: Holders of Other Secured Claims in Class 4 are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

5. Class 5 – Other Priority Claims

(a) *Classification*: Class 5 consists of Other Priority Claims.

(b) *Treatment*: On the later of (i) the Distribution Date, or (ii) the date such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, (i) Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim with Post-Petition Interest thereon, or (ii) such other treatment as the Debtor and such Holder shall have agreed upon in writing.

(c) *Voting*: Holders of Other Priority Claims in Class 5 are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

6. Class 6 – Critical Vendor Claims

(a) *Classification*: Class 6 consists of all Allowed Critical Vendor Claims.

(b) *Treatment*: On the later of (i) the Distribution Date, or (ii) the date that a Critical Vendor Claim becomes an Allowed Critical Vendor Claim, each Holder of an Allowed Critical Vendor Claims will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Critical Vendor Claim, (i) Cash in an amount equal to the unpaid portion of such Allowed Critical Vendor Claim with Post-Petition Interest thereon, or (ii) such other treatment as Halker Consulting or Reorganized Halker Consulting, as applicable, and such Holder shall have agreed upon in writing.

(c) *Voting*: Holders of Critical Vendor Claims in Class 6 are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

7. Class 7 – General Unsecured Claims Against Halker Consulting

(a) *Classification*: Class 7 consists of all Allowed General Unsecured Claims Against Halker Consulting.

(b) *Treatment*: Commencing on the later of (i) the last date of the month immediately following the Coulton Creek Final Payment Date, and (ii) the date such General Unsecured Claim against Halker Consulting becomes an Allowed General Unsecured Claim against Halker Consulting each Holder of an Allowed General Unsecured Claim against Halker Consulting will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim against Halker Consulting, such Holder's *pro rata* share of the sum of (i) $50,000.00 per month, plus (ii) 50% of Halker Consulting's monthly profits, if any, for the preceding month in excess of a $50,000 Monthly Working Capital Reserve, with interest to accrue on the unpaid portion of such Allowed General Unsecured Claim from the Effective Date at a rate of 7% per annum, until its Allowed General Unsecured Claim is paid in full, or (b) such other treatment as Halker Consulting or Reorganized Halker Consulting, as applicable, and such Holder shall have agreed upon in writing. All distributions on account of Allowed General Unsecured Claims against Halker Consulting shall be made quarterly, on the 15th day of the month. Commencing on the last day of the month immediately following the Coulton Creek Final Payment Date, the Debtors may, but will have no obligation to, prepay any additional amounts on account of the General Unsecured Claims against Halker Consulting, as they wish to pay in their sole discretion. Any prepayment of the General Unsecured Claims against Halker Consulting will be applied to the principal amount due and

owing at the time of payment, and the Reorganized Debtors will incur no additional fee, charge, or penalty in connection with any such payment.

(c) *Voting*: Holders of Claims in Class 7 are impaired under the Plan and, pursuant to section 1126(a) of the Bankruptcy Code, are entitled to vote to accept or reject the Plan.

8. Class 8 – General Unsecured Claims Against Matthew Halker

(a) *Classification*: Class 8 consists of the Allowed General Unsecured Claims against Matthew Halker that are not on account of or otherwise related in any way to a guaranty or obligation of Halker Consulting.

(b) *Treatment*: On the later of (i) the Distribution Date, or (ii) the date that a General Unsecured Claim against Matthew Halker that is not on account of or otherwise related in any way to a guaranty or obligation of Halker Consulting becomes an Allowed General Unsecured Claim against Matthew Halker, each Holder of such Allowed General Unsecured Claim against Matthew Halker will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim against Matthew Halker, (i) Cash in an amount equal to the unpaid portion of such Allowed General Unsecured Claim against Matthew Halker with Post-Petition Interest thereon, or (ii) such other treatment as Matthew Halker and such Holder shall have agreed upon in writing.

(c) *Voting*: Holders of Claims in Class 8 are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

9. Class 9 – Interests in Halker Consulting

(a) *Classification*: Class 9 consists of all Interests in Halker Consulting.

(b) *Treatment*: On the Effective Date, all the Holders of Interests in Halker Consulting shall retain such Interests; *provided*, *however*, that until all Allowed Claims in Class 7 (General Unsecured Claims Against Halker Consulting) are paid in full in accordance with the Plan and the Confirmation Order, Halker Consulting will not declare or pay any dividends or otherwise make any distributions to Holders of Interests in Halker Consulting on account of such Interests except as may be necessary to pay taxes attributable to Halker Consulting.

(c) *Voting*: Holders of Interests in Halker Consulting are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.

## C. Acceptance or Rejection of the Plan

### 1. Voting of Claims

Each Holder of a Claim in an Impaired Class as of the Voting Record Date that is entitled to vote on the Plan pursuant to Article III of the Plan will be entitled to vote to accept or reject the Plan as provided in the Disclosure Statement Order or any other order of the Bankruptcy Court.

### 2. Class Acceptance Requirement

A Class of Claims accepts the Plan if it votes to accept by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of Holders of such Claims that have voted on the Plan.

### 3. Presumed Acceptance of Plan

Class 1 (Chase Secured Claim), Class 4 (Other Secured Claims), Class 5 (Other Priority Claims), Class 6 (Critical Vendor Claims), Class 8 (General Unsecured Claims Against Matthew Halker), and Class 9 (Interests in Halker Consulting) are Unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and the votes of such Holders will not be solicited.

### 4. No Presumed Rejection of Plan

All Classes of Claims and Interests will receive a distribution under the Plan on account of their Allowed Claims and Interests. Thus, no Class is conclusively presumed to have rejected the Plan.

### 5. Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors will seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims. The Debtors reserve the right to modify the Plan in accordance with Article VIII.B of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

### 6. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court will, after notice and a hearing, determine the controversy on or before the Confirmation Date; *provided* that nothing will affect or limit the Debtors' rights and defenses (whether legal or equitable) in respect of any such Claims, Interests, or Class of Claims or Interests.

## D. Implementation of the Plan

### 1. Continued Corporate Existence

Halker Consulting, as Reorganized Debtor, will continue to exist after the Effective Date with all of the powers of a limited liability company under the laws of the State of Colorado and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law, except as such rights may be limited and conditioned by the Plan, Confirmation Order, and/or the documents and instruments executed and delivered in connection therewith. Halker Consulting, as Debtor and Reorganized Debtor, will take all steps necessary to revive and/or reinstate its status with the Colorado Secretary of State and remain a limited liability company in good standing with the Colorado Secretary of State. Halker Consulting, as Reorganized Debtor, may operate its business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, subject only to the terms and conditions of the Plan, the Confirmation Order, and the documents and instruments executed and delivered in connection herewith and therewith.

### 2. Sources of Consideration for Plan Distributions

Distributions under the Plan will be made from the Debtors' and Reorganized Debtors' Cash on hand and post-Effective Date revenues as set forth in this Plan and the Plan Supplement Documents. The financial projections set forth in Exhibit B to this Disclosure Statement illustrate these sources and uses during the anticipated life of the Plan.

### 3. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

### 4. Listing of Securities

None of the securities issued pursuant to the Plan will be listed on a national securities exchange and Reorganized Halker Consulting will not be a reporting company under the Securities Exchange Act upon the Effective Date.

### 5. Vesting of Property

Except for the CoBiz, Coulton Creek, and Chase Liens, and Liens pertaining to Other Secured Claims preserved under the Plan, and as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, the Reorganized Debtors will be vested with all of the Property free and clear of all Claims, Liens, encumbrances, charges and other interests of creditors and equity security holders. The Reorganized Debtors will thereafter hold, use, dispose, or otherwise deal with such Property, or operate their business and affairs, free of any restrictions imposed by the Bankruptcy Code or by the Court. Except to the extent released in the Plan, all Causes of Action will be preserved in full for the Reorganized Debtors' benefit. After the Effective Date, the Reorganized Debtors will own and retain, and may prosecute,

enforce, compromise, settle, release, or otherwise dispose of, the Causes of Action in their sole discretion without the need of any approval by the Bankruptcy Court. The Reorganized Debtors will also be entitled to assign such rights.

**6. Reinstatement and Continuation of Insurance Policies.**

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtor's insurance policies in existence on and as of the Confirmation Date will be reinstated and continued in accordance with its terms and, to the extent applicable, will be deemed assumed by the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code.

**7. Preservation of Causes of Action**

The Reorganized Debtors will retain all rights and all Causes of Action accruing to them and their respective Estates, including Avoidance Actions and those arising under sections 505, 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505 of the Bankruptcy Code, other than as expressly provided below. Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order will be deemed a waiver or relinquishment of an Claim, Cause of Action, right of setoff, or other legal or equitable defense that either Debtor has that is not specifically waived or relinquished by the Plan. The Reorganized Debtors will each have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that it has as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' respective legal and equitable rights respecting any Claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**8. Administrative Claims Incurred After the Confirmation Date**

Administrative Claims incurred by the Reorganized Debtors after the Confirmation Date, including Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without the need for Bankruptcy Court approval.

**E. Provisions Governing Distributions**

**1. Allowed Claims**

**a. Delivery of Distributions**

Subject to Article V of the Plan, distributions under the Plan will be made by the applicable Reorganized Debtor or its designee to the Holders of Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by a proof of claim or transfer of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date (or at the last known addresses of such Holders if the Debtor or the Reorganized Debtor, as the case may be, has been notified in writing of a change of address).

**b. Distribution of Cash**

Any payment of Cash by a Reorganized Debtor pursuant to the Plan will be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtor.

**c. Unclaimed Distributions**

Any distribution of Cash under the Plan to the Holder of an Allowed Claim that remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan will be transferred to and become property of the applicable Reorganized Debtor notwithstanding state or other escheat or similar laws to the contrary, and any and all entitlement by the Holder of such Claim to such distribution will be extinguished and forever barred.

**d. Saturdays, Sundays, or Legal Holidays**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and will be deemed to have been completed as of the required date.

**e. Distributions to Holders of Allowed Claims as of the Distribution Record Date**

As of the close of business on the Distribution Record Date, the Claims register will be closed, and there will be no further changes in the record holders of any Claims. The Reorganized Debtors will have no obligation to recognize any Claim filed or transfer of any Claims occurring after the Distribution Record Date. The Reorganized Debtors will instead be entitled to recognize and deal for purposes of the Plan with only those record holders stated on the Claims register as of the close of business on the Distribution Record Date.

**F. Disputed Claims**

**1. Resolution of Disputed Claims**

**a. Objections to and Resolution of Claims**

From and after the Effective Date, the Reorganized Debtors will have the exclusive authority, in their sole discretion, to file, settle, compromise, withdraw, or litigate to judgment all objections, if any, to Administrative Claims and Claims, except the CoBiz Secured Claim, the Coulton Creek Secured Claim, and the Chase Secured Claim, which Claims are Allowed under this Plan. Unless otherwise ordered by the Court, objections to, or other proceedings concerning, the allowance of Claims (other than objections to Administrative Claims, as provided in Article III.A.1) will be filed and served upon the Holders of the Claims as to which the objection is made or otherwise commenced as soon as practicable, but in no event later than sixty (60) days after the Effective Date.

Objections to, or other proceedings contesting the allowance of, Claims may be litigated to judgment, settled or withdrawn, in the Reorganized Debtors' sole discretion.

**b. Establishment of Disputed Claims Reserve**

On the initial Distribution Date, the Reorganized Debtors will establish a Disputed Claim Reserve for all Disputed Claims that would be paid in full under the Plan on the initial Distribution Date if such Disputed Claims were Allowed Claims in an aggregate amount equal to the liquidated, non-contingent face value of such Claims. To the extent any such Disputed Claim is in whole or in part unliquidated and/or contingent as of the Distribution Date, the Reorganized Debtor, in its sole discretion, may elect not to deposit any amount in the Disputed Claim Reserve on account of such unliquidated and/or contingent portion of such Disputed Claim. No later than five (5) Business Days following the entry of a Final Order either (a) Allowing such Disputed Claim (in whole or in part) or (b) disallowing such Disputed Claim (in whole or in part), the Reorganized Debtor shall (i) to the extent such Claim has been Allowed in whole or in part, distribute to the Holder of such Claim an amount equal to the amount such Holder would have received had such Claim (or portion thereof) been an Allowed Claim on the Effective Date, and (ii) to the extent such Claim has been Disallowed, retain the balance of the funds on deposit in such Disputed Claim Reserve equal to the portion of such Claim that has been Disallowed.

**c. Estimation**

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used by the Reorganized Debtors or their designee in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

**G. Substantive Consolidation of the Debtors for Plan Purposes**

Solely in connection with distributions to be made under this Plan to holders of Allowed Claims that are Allowed as of the date of such distributions, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Bankruptcy Court provide in the Confirmation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case for purposes of this Plan and the distributions hereunder.

Pursuant to the Confirmation Order (i) all assets and liabilities of the Debtors will be deemed to be merged solely for purposes of this Plan and Distributions to be made under the Plan on the Distribution Date, (ii) the obligations of each Debtor will be deemed to be the

obligation of the substantively consolidated Debtors solely for purposes of this Plan and distributions under the Plan, (iii) all Claims and Causes of Action between the Debtors will be eliminated, (iv) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (v) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Case in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (vi) all transfers, disbursements, and distributions made by any Debtor hereunder will be deemed to be made by the substantively consolidated Debtors, and (vii) all guarantees of the Debtors of the obligations of the other Debtor shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors, solely for purposes of this Plan and distributions made under this Plan. Such substantive consolidation shall not affect (i) the legal and corporate structure of Halker Consulting or Reorganized Halker Consulting, or (ii) each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6), which obligations shall continue until an order is entered closing, dismissing, or converting each such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan will serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates. If no objection to substantive consolidation is timely filed and served, then the substantive consolidation provided for in this Plan may be approved by the Confirmation Order.

## H. Executory Contracts and Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts of the Debtor will be deemed assumed in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, *except* for those Executory Contracts that: (a) have already been rejected by order of the Bankruptcy Court; (b) are listed as rejected Executory Contracts in Exhibit [__] to the Plan Supplement; or (c) are subject to a motion to reject that is pending on the Effective Date.

Each Executory Contract assumed pursuant to this Plan will vest and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.

### 2. Cure

Except as otherwise agreed to by the parties, on the Effective Date, the applicable Debtor or Reorganized Debtor, as the case may be, will cure any and all undisputed defaults under any Executory Contract that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed defaults that are required to be cured will be cured by the later to occur of (i) seven (7) days after

the entry of a Final Order determining the amount, if any, of the liability with respect thereto, and (ii) the initial Distribution Date.

### 3. Rejection Damage Claims

All Claims for damages arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day that is twenty-eight (28) days after the Effective Date or the first Business Day that is twenty-eight (28) days after the entry of the Final Order approving the rejection, if such Final Order is entered after the Confirmation Date. Every such Claim that is timely filed, as and when it becomes and Allowed Claim, will be treated as a General Unsecured Claim against Halker Consulting under Class 7 of the Plan. Every such Claim that is not timely filed by the deadline to do so shall be forever barred, unenforceable, and discharged, and the Creditor holding the Claim shall not receive or be entitled to any Distribution under the Plan on account of such Claim. Notwithstanding anything contained in this Plan, the applicable Debtor or Reorganized Debtor, as the case may be, reserves the right to object to any Claim arising from the rejection of an Executory Contract.

## I. Effect of Confirmation

### 1. Discharge of Halker Consulting

Except as otherwise provided in the Plan, and conditioned on the making of the distributions provided for under the Plan and the rights afforded under the Plan, the treatment of all Claims and Interests herein will be in exchange for and in complete satisfaction of, discharge, and release of all Claims or Interests of any kind or nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Halker Consulting, as Debtor or Reorganized Debtor, or any of its assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order will act as of the Effective Date as a discharge of all debts of, Claims against, Liens on, and Interests in Halker Consulting, its Assets and Properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Interest with respect to thereto was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution hereunder. Except as otherwise expressly specified in the Plan, after the Effective Date, any Holder of such discharged Claim or Interest will be precluded from asserting any other or further Claim against, or Interest in, the Halker Consulting, as Debtor or Reorganized Debtor, or any of its assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

### 2. Discharge of Matthew Halker

Except as otherwise provided in the Plan, and conditioned on the making of the distributions provided for under the Plan and the rights afforded under the Plan, the treatment of all Claims and Interests in the Plan against Matthew Halker shall be in exchange for and in complete satisfaction of, discharge, and release of all Claims or Interests of any kind or nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Matthew Halker, as Debtor or Reorganized Debtor, or any of his assets or properties,

arising prior to the Effective Date. Upon the completion of all payments under the Plan, Matthew Halker will request after notice pursuant to L.B.R. 9013 that the Court enter a discharge pursuant to section 1141(d)(5) of the Bankruptcy Code of all debts of, Claims against and Liens on, Matthew Halker, his Assets and his Properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Interest with respect to thereto was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution under the Plan. Except as otherwise expressly specified in the Plan, as of the Effective Date, any Holder of such discharged Claim or Interest will be precluded from asserting any other or further Claim against Matthew Halker, as Debtor or Reorganized Debtor, or any of his assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

**3. Exculpation**

**Except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan, no Exculpated Party will have or incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan or the transactions pursuant to the Plan, the Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided* that each Exculpated Party will be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; *provided further* that the foregoing exculpation will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, bad faith, or willful misconduct.**

**4. Injunction**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against, or Interests in, the Debtors, or who assert rights in or against the Debtors or their Property, that arose before or were held as of the Effective Date, along with their respective Insiders, employees, agents, officers, directors, principals or representatives are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against or affecting the Debtors, their Estates, their Assets, their Property, the Reorganized Debtors, or any of their property or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection, levy or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, their Estates, their Assets, the Property, the Reorganized Debtors, or any of the property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor on account of any**

**such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, their Estates, the Assets, the Property, the Reorganized Debtors, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons on account of any such Claim or Interest; (d) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Interest; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (f) taking any action to interfere with the implementation of the Plan; and (g) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner, any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; *provided*, *however*, that nothing contained this provision will preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan.**

## J. Conditions Precedent to Confirmation and Consummation of the Plan

### 1. Conditions Precedent to the Effective Date

The Plan will not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived:

(a) the Confirmation Order, which must be, in form and substance, satisfactory to the Debtors in their sole and absolute discretion, has been entered;

(b) no stay or injunction is in effect precluding the consummation of the transactions contemplated by the Plan and the Confirmation Order, and the Confirmation Order has not been modified or vacated on appeal;

(c) all statutory fees then due and payable to the United States Trustee have been paid in full;

(d) all documents to be executed, delivered or filed pursuant to the Plan, including all Plan Documents, are in a form satisfactory to the Debtors in its sole and absolute discretion and have been executed, delivered or filed, as the case may be; and

(e) all actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed and shall remain in full force and effect.

### 2. Effect of Non-Occurrence of Conditions to the Effective Date

In the event that the Effective Date does not occur, upon notification submitted by the Debtors to the Bankruptcy Court: (a) the Confirmation Order will be vacated and all provisions contained therein, including without limitation, any provisions relating to discharge, will be null and void, (b) no distribution under the Plan will be made, (c) the Debtors and all holders of

Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, (d) the obligations with respect to the Claims and Interests will remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors, and (e) nothing contained in the Plan will (i) prejudice in any manner the rights of the Debtors, (ii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect, including in any proceeding or case against the Debtors, or (iii) be admissible in any action, proceeding or case against the Debtors in any court or other forum.

### 3. Vacatur of Confirmation Order

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan will be null and void in all respects, and nothing contained in the Plan will (a) prejudice in any manner the rights of the Debtors, (b) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect, including in any proceeding or case against either Debtor, or (c) be admissible in any action, proceeding or case against the Debtors in any court or other forum.

## K. Modification, Revocation or Withdrawal of the Plan

The Debtors may alter, amend, or modify the Plan before the Confirmation Date as provided in section 1127 of the Bankruptcy Code. After the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may, with the approval of the Bankruptcy Court, without notice to all holders of Claims or Interests, insofar as it does not materially and adversely affect the Holders of Claims or Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan. After the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, may alter or amend the Plan in a manner which, as determined by the Bankruptcy Court, materially and adversely affects Holders of Claims or Interests, provided that such alteration or modification is made after notice and a hearing as provided in section 1127 of the Bankruptcy Code.

## L. Retention of Jurisdiction by the Bankruptcy Court

The Bankruptcy Court will have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters; (3) to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Interest; (5) to hear and determine timely objections to, or other proceedings challenging the allowance of, Administrative Claims and Claims (including, without limitation, proceedings under section 502(c) of the Bankruptcy Code), (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any

reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires an order of, or other relief from, the Bankruptcy Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine any Causes of Action preserved under the Plan; (14) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in the Plan; and (15) to enter a final decree closing the Chapter 11 Cases.

## M. Miscellaneous

### 1. Binding Effect

The rights, benefits, and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of, the heir, executor, administrator, successor or assign of such Person.

### 2. Payment of Statutory Fees

All fees payable on or before the Effective Date pursuant to 28 U.S.C. § 1930 will be paid by the applicable Debtor on or before the Effective Date and all such fees payable after the Effective Date will be paid by the applicable Reorganized Debtor as and when such fees become due.

### 3. Governing Law

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Colorado (without reference to the conflicts of laws provisions thereof) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### 4. Filing or Execution of Additional Documents

On or before the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 5. No Tax Withholding

No federal, state, or local income, capital gains, or other taxes will be deducted from distributions under the Plan and no Person will be entitled to receive any additional

distribution as a result of any such tax. Each Person receiving any Distribution, forgiveness of any debt, or experiencing any other taxable event hereunder, will be solely responsible for payment of any such taxes.

**6. Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a)**

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) will not apply to the Confirmation Order and (b) authorization to consummate the Plan immediately after entry of the Confirmation Order.

**7. Notices**

All notices, requests, and demands hereunder to be effective shall be in writing and, unless otherwise expressly provided in the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To Either Reorganized Debtor:

Matthew Halker
c/o Halker Consulting LLC
7936 E. Arapahoe Ct., Suite 3200
Centennial, Colorado 80112

With a copy to:

Adam L. Hirsch, Esq.
Kutak Rock LLP
1801 California St., Suite 3000
Denver, Colorado 80202

**8. Term of Injunction or Stays**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.

## ARTICLE VI.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

## A. The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING FOR [_____], 2017 AT [__]:[__] [_].M. (PREVAILING MOUNTAIN TIME) BEFORE THE HONORABLE [_________], UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF COLORADO, LOCATED AT 721 19TH STREET, DENVER, COLORADO 80202. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT (i) PRIOR TO THE CONFIRMATION HEARING BY POSTING NOTICE OF SAME ON THE DOCKET FOR THE CHAPTER 11 CASES AND (ii) AT THE CONFIRMATION HEARING WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [___________], 2017 IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE APPROVAL ORDER, THE CONFIRMATION HEARING NOTICE AND THE VOTING PROCEDURES, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## B. Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Debtors believe that section 1129 has been satisfied because, among other things:

(a) the Plan complies with the applicable provisions of the Bankruptcy Code;

(b) the Debtors, as Plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

(c) the Plan has been proposed in good faith and not by any means forbidden by law;

(d) any payment made or promised under the Plan for services or for costs and expenses of or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(e) the Debtors will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtor or a successor to the Debtors under the Plan. The appointment to, or continuance in,

such office of such individuals will be consistent with the interests of Claim and Interest Holders and with public policy;

(f) with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (*see* Article VI.C below);

(g) each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code;

(h) except to the extent that the Holder of a particular Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full in Cash on the Effective Date;

(i) except to the extent that a Holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such Holder shall receive Cash in an amount equal to the Allowed amount of such Claim, or treatment in any other manner so that such Claim shall otherwise be rendered Unimpaired, on the initial Distribution Date;

(j) except to the extent that the applicable Creditor has been paid by the Debtors prior to the Effective Date or the applicable Debtor and such Creditor agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim against any of the Debtors will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) payment in full in Cash, or (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

(k) at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

(l) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(m) all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date.

## C. Best Interests Test

### 1. Explanation of the Best Interests Test

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accept the Plan or (b) receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is often called the "Best Interests Test").

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan. If the hypothetical liquidation distribution to Holders of Claims or Interests in any Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

### 2. Liquidation Analysis of the Debtors

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "Liquidation Analysis"), which is attached hereto as Exhibit C.

As described in the Liquidation Analysis, the Debtors developed the Liquidation Analysis for the Debtors based on the unaudited book values as of June 1, 2017, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims, as the Debtors' claim objection and reconciliation process continues.

As described in the Liquidation Analysis, underlying the analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (i) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and (ii) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test" pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

### 3. Application of the Best Interests Test

The Debtors believe that the continued operation of the Debtors as a going concern satisfies the Best Interests Test for the Impaired Classes. Notwithstanding the difficulties in quantifying recoveries to Holders of Claims and Interests with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test. As the Plan and the Liquidation Analysis indicate, confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D. Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of a chapter 11 plan, that a bankruptcy court find that such confirmation is not likely to be followed by the liquidation of the debtors or the need for further financial reorganization, unless such liquidation is contemplated by the plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed their ability to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As part of this analysis the Debtors, with the assistance of their advisors, have prepared financial projections (the "Financial Projections") attached to this Disclosure Statement as Exhibit B.

Financial Projections have been prepared solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the projection period may vary from the Financial Projections. All Holders of Claims in the Impaired Classes

are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

## E. Acceptance by Impaired Classes

Except as described in Article VI.F below, the Bankruptcy Code also requires, as a condition to confirmation of a chapter 11 plan, that each impaired class of claims or interests accept the plan. A class of claims or interests that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest or (ii) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of the Plan by an Impaired Class as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class; only those Holders that are eligible to vote and that actually vote to accept or reject the Plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if Holders of such Interests holding at least two-thirds in amount that actually vote have voted to accept the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

## F. Confirmation without Acceptance by All Impaired Classes

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether the Plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity Holders, as follows:

- Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests. Either (i) each Holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled or the value of the interest or (ii) the Holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

A plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting class if the value of the Cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

The Debtors believe and will demonstrate in connection with Confirmation that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting Class.

### G. Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative Claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VII.
## VOTING PROCEDURES

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes. On [__________], 2017, the Bankruptcy Court entered an order (a) establishing procedures for soliciting votes on the Plan, setting [_________] as the deadline for voting on the Plan, setting [__________] as the deadline to object to confirmation of the Plan, and setting [_________] as the date of the confirmation hearing.

## A. Who Is Entitled to Vote on the Plan?

In general, a Holder of a Claim or Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the plan, and (iii) the Holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest. The Holders of Claims in the following Classes are entitled to vote on the Plan:

- Class 2 – CoBiz Secured Claim
- Class 3 – Coulton Creek Secured Claim
- Class 7 – General Unsecured Claims Against Halker Consulting

Under section 1126(f) of the Bankruptcy Code, classes that are not impaired under a plan of reorganization are deemed to accept the plan. The following Classes are Unimpaired under the Plan and deemed under section 1126(f) of the Bankruptcy Code to accept the Plan:

- Class 1 – Chase Secured Claim
- Class 4 – Other Secured Claims
- Class 5 – Other Priority Claims
- Class 6 – Critical Vendor Claims
- Class 8 – General Unsecured Claims Against Matthew Halker
- Class 9 – Interest in Halker Consulting

Their votes to accept or reject the Plan will not be solicited.

## B. Voting Procedures

**IN THE CASE OF ALL VOTERS, BALLOTS MUST BE RECEIVED BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESS:**

Kutak Rock LLP<br>
Counsel to Halker Consulting, LLC and Matthew Halker<br>
1801 California St., Suite 3000<br>
Denver, Colorado 80202<br>
Attn: Adam L. Hirsch, Esq.

**IF YOU HAVE ANY QUESTIONS REGARDING VOTING PROCEDURES, PLEASE CALL MR. HIRSCH AT (303) 297-2400.**

Ballots received after the Voting Deadline will not be counted by the Debtors in connection with the Debtors' request for confirmation of the Plan. Delivery of ballots will be

deemed made only when the original executed Ballot is *actually received* by Debtors' counsel. In all cases, sufficient time should be allowed to assure timely delivery. Original executed Ballots are required. Delivery of a Ballot by facsimile, email or any other electronic means will not be accepted. No Ballot should be sent to the Debtors, their agents (other than Debtors' counsel above), any indenture trustee or the Debtors' financial or legal advisors (other than Debtors' counsel above), and if so sent will not be counted. If no Holder of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class will be deemed to accept the Plan.

## ARTICLE VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE DEBTORS ARE NOT PROVIDING TAX ADVICE TO CREDITORS OR INTEREST HOLDERS. THE TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE INDIVIDUALIZED AND MAY BE COMPLEX. THIS DISCLOSURE STATEMENT ACCORINGLY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION OR OTHER TAX LAWS THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE IX.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders entitled to vote on the Plan vote to accept the Plan and support Confirmation.

Dated: June 1, 2017

Respectfully submitted,

Halker Consulting, LLC

By: ______________________
Name: Matthew Halker
Title: Manager

Matthew Halker

______________________

# Exhibit A

## Joint Chapter 11 Plan of Reorganization

[Filed under separate cover]

## Exhibit B

## Financial Projections for Halker Consulting

[To be filed under separate cover]

**Exhibit C**

**Liquidation Analysis**

[To be filed under separate cover]